UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| ANGEL CHERIE JENSEN, | Case No. 4:19-cv-00039-DCN |
| Plaintiff, | |
| | **MEMORANDUM DECISION AND ORDER** |
| v. | |
| DEPUTY ALLEN; SERGEANT HUGHES; JULIE GUIBERSON; and CORPORAL LUCE, | |
| Defendants. | |

## I. INTRODUCTION

Pending before the Court is Defendants Deputy Lacey Allen, Sergeant Jake Hughes, Julie Guiberson, and Corporal Albert Luce's ("Defendants") Motion for Summary Judgment (Dkt. 29). Having reviewed the record and briefs, the Court finds that the facts and legal arguments are adequately presented. Accordingly, in the interest of avoiding further delay, and because the Court finds that the decisional process would not be significantly aided by oral argument, the Court will decide the Motion without oral argument. Dist. Idaho Loc. Civ. R. 7.1 (d)(1)(B).

For the reasons set forth below, the Court finds good cause to GRANT Defendants' Motion for Summary Judgment.

## II. BACKGROUND[1]

Plaintiff Angel Cherie Jensen is a prisoner. During the search at issue in this case, Jensen was serving part of her period of incarceration at the Bannock County Detention Center ("BCDC"). Jensen was in the BCDC's work release program, and was authorized to leave the facility during working hours. Inmates who leave BCDC for work are subjected to strip searches prior to reentering the work release housing unit.

On January 19, 2019, Jensen's work release was revoked after she returned to the BCDC approximately one hour late. Because she was no longer qualified for work release, Jensen was assigned to a new housing unit. After she was relocated, Jensen sent a message to her mother asking her to come and move Jensen's car immediately due to contents that could be found in it. Upon receipt of the message, Probation Officer Julie Guiberson, a female, authorized and assisted with a search of Jensen's car. Guiberson then requested that Jensen be taken to the booking area of the jail to discuss the results of the search.

Jensen was brought to the booking area, moved into the shower area, and informed she was going to be searched. Jensen immediately "freaked out" and began resisting Guiberson and Deputy Lacey Allen, another female officer who Guiberson asked to assist with the search. Dkt. 28-6, Ex B at 52:4–17.[2] While yelling, "don't fucking touch me," Jensen pulled away and tried to wrestle free from Guiberson and Allen. Dkt. 28-2, ¶ 7. During the struggle, Allen observed Jensen reach her left hand into the groin area of her

---

[1] The following facts are undisputed.
[2] Citations from Jensen's deposition (Dkt. 28-6, Ex. B) are to the page of the deposition transcript. All other page citations are to the ECF-generated page number.

jumpsuit. Not knowing what might be concealed in Jensen's jumpsuit, Allen and Guiberson attempted to gain control over Jensen's arms. As they struggled to secure her arms, Jensen continued to wrestle and resist. Allen called for backup, and male officers Sergeant Hughes and Corporal Luce responded to the call.[3] Jensen continued to resist and attempted to fight the officers, at times knocking them off balance. Eventually, Jensen was subdued and handcuffed. Allen then used scissors to cut open the legs of Jensen's jumpsuit. In addition to the jumpsuit, Jensen was wearing a sports bra, t-shirt, underwear, and boxers.

At her deposition, Jensen testified she again started "freaking out" (including by screaming and resisting) when Allen cut open her jumpsuit. Dkt. 28-6, Ex. B at 32:1–4. However, the officers were able to move Jensen into a standing position, and Allen and Guiberson performed a pat-down search. Allen ordered Jensen to step out of her boxers, and Jensen complied. Allen then conducted a visual search of Jensen's body, and viewed a visible protrusion in the crotch area of Jensen's underwear. Allen pulled the waistband of Jensen's underwear slightly away from Jensen's body and saw a large bundle of plastic sticking out of Jensen's vagina. Allen asked Guiberson to step in front of Jensen to assist with the remainder of the search. Allen then put on gloves, secured the end of the plastic, and removed it from Jensen's vaginal area. The plastic bundle contained various pills and a white crystal-like substance.

During the aforementioned removal, two male officers, including Hughes, and at times, Luce, maintained control of Jensen's arms while standing behind her, but did not

---

[3] It appears that two other officers, "Deputy Brown" and "Deputy Bowen," also responded to the call. Dkt. 28-2, ¶¶ 8–9. As neither is a defendant in this action, they are not further discussed herein.

conduct any other part of the search. At all times during the search—including when Allen removed the contraband—Jensen's jumpsuit was intact from her shoulders to her legs and covered her entire backside. Hughes attested that he made sure Jensen's jumpsuit covered her so that none of her body was exposed to male deputies. Dkt. 28-3, ¶ 5–6. After Allen removed the contraband from Jensen's body, Allen and Guiberson moved Jensen into a shower stall to continue the search. Luce and Hughes remained nearby to provide backup if necessary, but did not assist with, or view, any aspect of the search that occurred once Jenson was moved to the shower stall. Luce and Hughes attested that throughout the entire search, they could not and did not see Jensen's private parts. Dkt. 28-3, ¶ 9; Dkt. 28-4, ¶ 9. Jensen also confirmed the male officers did not touch any part of her body other than her arms during the entire incident. Dkt. 28-6, Ex. B at 45:9–15.

On February 1, 2019, Jensen filed a *pro se* Complaint alleging various violations of 42 U.S.C. § 1983. Dkt. 1. After the Court twice reviewed, dismissed, and permitted Jenson to amend, Jensen was ultimately allowed to proceed with Fourth Amendment invasion of privacy claims against Guiberson, Allen, Hughes, and Luce.[4] Dkt. 20. On August 9, 2021, Defendants filed the instant motion for summary judgment. Dkt. 28. On August 10, 2021, the Court sent Jensen its standard Notice to pro se litigants regarding her rights and obligations on summary judgment. Dkt. 29. To date, Jensen has not responded to Defendants' Motion for Summary Judgment.

---

[4] The Court initially granted Jensen's request for pro bono counsel. Dkt. 14. However, when court staff was unable to find pro se counsel to assist Jensen, the Court permitted to proceed pro se. Dkt. 16; Dkt. 20.

### III. LEGAL STANDARDS

**Summary Judgment**

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court's role at summary judgment is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). The Court does not make credibility determinations at this stage of the litigation, as such determinations are reserved for the trier of fact. *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 507 (9th Cir. 1992).

To defeat a motion for summary judgment, the respondent need only present evidence upon which "a reasonable juror drawing all inferences in favor of the respondent could return a verdict in the respondent's favor." *Zetwick v. Cty. of Yolo*, 850 F.3d 436, 441 (9th Cir. 2017) (citation omitted). Accordingly, the Court must enter summary judgment if a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The respondent cannot simply rely on an unsworn affidavit or the pleadings to defeat a motion for summary judgment; rather the respondent must set forth the "specific facts," supported by evidence, with "reasonable particularity" that preclude summary judgment. *Far Out Productions, Inc. v. Oskar*, 247 F.3d 986, 997 (9th Cir. 2001).

**Fourth Amendment**

The Fourth Amendment protects the "right of the people to be secure in their

MEMORANDUM DECISION AND ORDER - 5

persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. Amend. IV. While "convicted prisoners do not forfeit all constitutional protections by reason of their convictions and confinement in prison," *Bell v. Wolfish*, 441 U.S. 520, 545 (1979), a "right of privacy in traditional Fourth Amendment terms is fundamentally incompatible with the close and continual surveillance of inmates and their cells required to ensure institutional security and internal order." *Hudson v. Palmer*, 468 U.S. 517, 527–28 (1984). As such, the Supreme Court has held that whether a search of an inmate is reasonable under the Fourth Amendment requires a case-by-case "balancing of the need for the particular search against the invasion of personal rights that the search entails." *Bell*, 441 U.S. at 559. In striking this balance, a court must consider "the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted." *Id*. (citations omitted). Prisoners retain their right to be free from searches that are "excessive, vindictive, harassing, or unrelated to any penological interest." *Michenfelder v. Sumner*, 860 F.2d 328, 332 (9th Cir. 1988).

**Qualified Immunity**

The doctrine of qualified immunity protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). An officer with qualified immunity is not liable even when his or her conduct resulted from "a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (internal quotations omitted). Qualified immunity "balances two important

interests—the need to hold public officials accountable when they exercise power irresponsibility and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Id.* When properly applied, qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986).

There are two prongs to the qualified immunity analysis: (1) whether the facts alleged show the defendant's conduct violated a constitutional right; and (2) whether the right was "clearly established" at the time of the defendant's alleged misconduct. *Pearson*, 555 U.S. at 232 (citing *Saucier v. Katz*, 533 U.S. 194, 201 (2001)). The Court need not address the prongs in a particular order. *Pearson*, 555 U.S. at 236.

## IV. ANALYSIS

Before addressing the substance of Defendants' Motion for Summary Judgment, the Court highlights a procedural issue which renders all facts undisputed. As noted, Defendants filed their Motion for Summary Judgment on August 9, 2021. On August 10, 2021, the Clerk of the Court sent Jensen the Court's standard Notice to pro se litigants.[5] The Notice explained what a motion for summary judgment is, and how and when Jensen needed to respond to the motion. The Notice also included the following warning:

> **You are warned** that if you do not file your response opposing the motion within 21 days (or such other time period set by the Court), the Court will consider the facts provided by the moving party as undisputed and **may grant the motion** based on the record before it, or it **may dismiss your**

---

[5] In *Klingele v. Eikenberry,* 849 F.2d 409, 411–12 (9th Cir.1988), the Ninth Circuit held that prisoners (and others) must receive fair notice of the requirements of Rule 56. In this Court—as in courts across the nation—this notice is a standard form sent to all pro se litigants (including prisoners) explaining Rule 56 and what pro se litigants must do when a motion under Rule 56 has been filed.

**entire case for failure to prosecute** (abandonment of your case). *See* Local
Rule 7.1(e)(2); Fed. R. Civ. P. 41(b).

Dkt. 29, at 2 (emphasis in original).

Further, Local Rule 7.1 outlines:

In motions brought under Federal Rule of Civil Procedure 56, if the non-
moving party fails to timely file any response documents required to be filed,
such failure shall not be deemed a consent to the granting of said motion by
the Court. However, if a party *fails to properly support an assertion of fact
or fails to properly address another party's assertion of fact* as required by
Federal Rule of Civil Procedure 56(c) or Local Rule 7.1(b)(1) or (c)(2), the
Court *may consider the uncontested material facts as undisputed for
purposes of consideration of the motion, and the Court may grant summary
judgment* if the motion and supporting materials - including the facts
considered undisputed - show that the moving party is entitled to the granting
of the motion.

Dist. Idaho Loc. Civ. R. 7.1(e)(2) (emphasis added).

To date, Jensen has not filed anything with the Court in response to Defendants'

Motion for Summary Judgment. Pursuant to this Court's Notice to Jensen, as well as Local

Rule 7.1, the Court considers the uncontested facts presented by Defendants to be

undisputed.

**A. Reasonableness of the Search**

As noted, to determine whether the search was reasonable, the Court must balance

the need for the search against the invasion of personal rights that the search entailed. *Bell*,

441 U.S. at 559. To properly conduct this balance, the Court turns to the factors outlined

in *Bell*. 441 U.S. at 559.

*1. Scope of the Intrusion*

Given both the nature of the search and the presence of male officers, the scope of

MEMORANDUM DECISION AND ORDER - 8

the intrusion in this case was significant. In *Bell*, the Supreme Court held it was constitutional to require inmates to expose their body cavities for visual inspection as a part of routine strip searches conducted after every contact visit between inmates and individuals from outside the institution. *Id.* at 558–60. While strip searches are required under BCDC's work release policy when inmates have contact with the public, the search at issue went beyond a visual strip search, and beyond even a visual inspection of Jensen's bodily cavity. Unlike in *Bell* and other cases where the Supreme Court has upheld searches which involved viewing—but not touching—an inmate's bodily cavity, here the search included restraining Jensen, cutting open her jumpsuit, viewing her vaginal area, and physically removing contraband from it. *See Bell*, 441 U.S. at 558 n. 39 (noting that inmates were not touched by security at any time during the body cavity searches at issue); *Florence v. Bd. of Chosen Freeholders of Cty. of Burlington*, 566 U.S. 318, 325 (2012) ("In the instant case, the [visual body cavity search] does not include any touching of unclothed areas by the inspecting officer.").[6] As the Ninth Circuit has held, the intrusiveness of a body cavity search "cannot be overstated." *Fuller v. M.G. Jewelry*, 950 F.2d 1437, 1445 (9th Cir. 1991) (citation omitted).

The search of Jensen was also conducted in the presence of male officers. The Ninth Circuit has long recognized that the "desire to shield one's unclothed figure from [the] view of strangers, and particularly strangers of the opposite sex, is impelled by elementary self-respect and personal dignity." *Byrd v. Maricopa Cty. Sheriff's Dept.*, 629 F.3d 1135, 1142

---

[6] Of course, if the visual body cavity searches at issue in *Bell* and *Florence* had revealed contraband—as the search did here—it is implausible that officers would *not* remove it.

(9th Cir. 2011) (quoting *York v. Story*, 324 F.2d 450, 455 (9th Cir. 1963)). In *Byrd*, the Ninth Circuit held a cross-gender search was unreasonable as a matter of law where, in the process of conducting a search, a female cadet touched the male inmate's inner and outer thighs, buttocks, and genital area, and moved his penis and scrotum. 629 F.3d at 1142. Here, the male officers did not touch any part of Jensen's body other than her arms, but they were present while a female officer searched and removed contraband from Jensen's vagina. As with the search at issue in *Byrd*, here the restraint of Jensen's arms by male officers completely thwarted any desire on Jensen's part "to shield [her] unclothed figure from [the] view of strangers . . . of the opposite sex[.]" *Byrd*, 639 F.3d at 1142.

The severity of the scope of intrusion in this case weighs against finding the search was reasonable.

### 2.  *Manner of the search*

While it is undisputed that male deputies were present for the search, the male officers only arrived after Allen called for back-up. This call was necessitated by Jensen's actions, which included resisting and wrestling Allen and Guiberson, screaming obscenities, and reaching her hand into the groin area of her jumpsuit. Dkt. 28-2, ¶¶ 7–8. As Defendants note, due to Jensen's extreme behavior, "Allen did not have the luxury of requesting female only backup. . . . The backup that responded was the backup that was available." Dkt. 28-1, at 5. The male officers also could not leave the area prior to the strip search because Jensen continued to resist and fight after the male deputies arrived, at times knocking them off balance. Dkt. 28-2, at ¶ 8. Even when she was restrained in handcuffs, Jensen continued to struggle and, by her own admission, "freak[] out." Dkt. 28-6, Ex B at

MEMORANDUM DECISION AND ORDER - 10

32:3–4. In addition, Guiberson told the male officers that Jensen was concealing something in her clothes. Dkt. 28-3, at ¶ 4. Faced with a combative inmate who could have been reaching for drugs or a weapon, the male officers had no time to wait for female back-up to replace them. Unlike the search at issue in *Byrd*, here both the search, and the presence of male officers, were necessitated by emergent circumstances.

Further, also unlike in *Byrd*, officers of the opposite sex did not search Jensen. While Hughes and Luce restrained Jensen's arms, they did not otherwise participate in the strip search, and Allen, a female, conducted all physical aspects of locating and removing the contraband. The male officers also took steps to ensure they did not view any private areas of Jensen's body. Hughes stated he "made sure [Jensen's] jumpsuit, which was still attached around her shoulders, covered her backside to avoid exposing her bare skin to the male deputies." Dkt. 28-3, at ¶ 5. Luce also explained he and Hughes "positioned [them]selves behind Jensen to avoid seeing her exposed private areas. " Dkt, 28-4, ¶ 8. Both male officers attested they were unable to see—and did not see—any part of Jensen's private area during the entirety of the search. Dkt. 28-3, ¶ 9; Dkt. 28-4, ¶ 9. Jensen does not dispute this.

In short, the manner in which the search was conducted—including the presence of male officers—was necessitated by emergent circumstances. As such, this factor weighs in favor of a finding of reasonableness.

### 3.  *Justification for the Search*

"The difficulties of operating a detention center must not be underestimated by the courts." *Florence*, 566 U.S. at 326 (citing *Turner v. Safley*, 482 U.S. 78, 84–85 (1987)). "A

detention facility is a unique place fraught with serious security dangers. Smuggling of money, drugs, weapons, and other contraband is all too common an occurrence." *Bell*, 441 U.S. at 559. The potential for such smuggling appears even more likely where, as here, an inmate is permitted to leave a detention facility, interact with the public, and return to the facility through work release. As such, the BCDC policy requires all inmates who participate in work release to submit to a strip search upon their return to the facility.[7] Dkt. 28-6, Ex. A at 7. Inmates are required to read and initial each term of this policy, and to sign the agreement, in order to participate in the work release program. *Id.* at 5–6.

Policies such as this, which are "designed to keep contraband out of jails and prisons," have been upheld for more than forty years. *Florence*, 566 U.S. at 327 (citations omitted). "These cases establish that correctional officials must be permitted to devise reasonable search policies to detect and deter the possession of contraband in their facilities." *Id.* at 328. The Supreme Court has admonished, "in the absence of substantial evidence in the record to indicate that the [prison] officials have exaggerated their response to these considerations courts should ordinarily defer to their expert judgment in such matters." *Block v. Rutherford*, 468 U.S. 576, 584–85 (1984) (quoting *Bell*, 441 U.S. at 548). Although the reasonableness of a search depends upon the facts of a specific case, "[v]isual body cavity searches conducted after contact visits as a means of preventing prisoners' possession of weapons and contraband, even absent probable cause, have been found reasonable by the Supreme Court." *Michenfelder*, 860 F.2d at 331 (citing *Bell*, 441 U.S. at

---

[7] Jensen does not challenge the BCDC policy, but rather the presence of male officers when the policy was enforced.

558–60).

In addition to BCDC policy and the fact that Jensen had just had contact with the public, here the search was also independently justified by the reasonable suspicion officers obtained both before and during the search. *Fuller*, 950 F.2d at 1447 (explaining prisoners may be subjected to visual body cavity searches based on "reasonable suspicion" in order "to protect prisons and jails from smuggled weapons, drugs or other contraband which pose a threat to safety and security of penal institutions.").

Before the search, Jensen returned from work release an hour late, was discharged from the work release program, and was moved to another housing unit. Jensen immediately sent her mother a message instructing her to move Jensen's vehicle as soon as possible due to contents that could be found in it. Guiberson searched Jensen's car and, although the record is not entirely clear, appears to have located contraband in it. *See* Dkt. 28-2, ¶ 6 (explaining Guiberson requested that Jensen be taken to the booking area of the jail to "discuss the results of the search of her vehicle"). Although she ostensibly knew she could always be subjected to a strip search upon return from work release, Jensen immediately became combative, screamed "don't fucking touch me," and reached into the underwear area of her jumpsuit in an apparent attempt to conceal something. *Id.* ¶ 7. Once Allen called for backup, Jensen physically resisted the four defendants to avoid being searched. *Id.* ¶ 8. Jensen's conduct prior to the strip search gave officers reasonable suspicion to conduct a more invasive search.

Further, during the strip search, Allen observed a visible protrusion in the crotch area of Jensen's underwear. Dkt. 28-5, ¶ 10. Allen pulled the waistband slightly away from

Jensen's body and viewed a large bundle of "what looked like plastic sticking out approximately one inch between [Jensen's] labia and her underwear." *Id.* Even if Allen did not have reasonable suspicion to conduct a contact body cavity search prior to seeing the bulge in Jensen's underwear, Allen clearly had such suspicion when she saw plastic protruding from Jensen's vagina. The body cavity search does not appear to have been anticipated at the outset of the strip search but became necessary once Allen observed and felt the bulge in Jensen's underwear. *Id.* Moreover, under such circumstances *not* searching Jensen's vaginal area could have endangered not only the officers and other inmates, but could also have resulted in Jensen's overdose and/or death, as the plastic bag concealed in Jensen's vagina was filled with drugs. Dkt. 28-5, ¶ 11. Here there was reasonable suspicion for conducting not only the strip search, but also the contact body cavity search.

The justification for the search weighs in favor of a determination of reasonableness.

### 4. Place of the Search

Finally, the search took place in the shower area of the detention facility. Dkt. 28-1, at 4. Jensen was not exposed to other officers or inmates, and there were no cameras in the area. *Id.* The Ninth Circuit has encouraged prisons to "opt for less public searches when security considerations allow," *Michenfelder*, 860 F.2d at 333, and here the shower area was "perhaps the most private setting in the entire facility." Dkt. 28-1, at 4; *see also Bull v. San Francisco*, 595 F.3d 964, 975 (9th Cir. 2010) (finding prison policy requiring officers to conduct strip searches in a place that afforded privacy supported a conclusion that the policy was reasonable).

The place of the search weighs in favor of finding the search was reasonable.

MEMORANDUM DECISION AND ORDER - 14

*5. Conclusion*

The Court does not seek to minimize the severity of the scope of the intrusion Jensen suffered. The search was undoubtedly traumatic and humiliating. However, the other three *Bell* factors, and particularly the justification for the search, weigh in favor of finding the search was reasonable. Here the presence of male officers, although in many circumstances unconstitutional, was necessitated by the emergency presented through Jensen's actions both prior to and during the search. Jensen knew that she would be strip searched following her work release, she returned over an hour late to the facility, she apparently hid contraband in her car, she obviously attempted to conceal contraband in her crotch area, and she physically and verbally resisted a search by two females. Jensen's conduct necessitated the call for back-up. Jensen's conduct necessitated the immediate response by the closest officers, who were males. Jensen's conduct, in continuing to physically and verbally resist and fight after the male officers arrived, necessitated the search of Jensen's private parts while the males were holding her. But even after all of Jensen's actions, the officers still protected Jensen's constitutional right regarding privacy to the greatest extent possible. Under the unique circumstances of this case, the Court finds the search was reasonable.

**B.  Defendants are Entitled to Qualified Immunity**

Although the Court finds the search did not run afoul of the Fourth Amendment's prohibition against unreasonable searches, summary judgment is also appropriate because Defendants are entitled to qualified immunity even if the search was unreasonable. Qualified immunity shields officials from civil liability so long as their conduct "'does not

violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Saucier*, 533 U.S. at 231 (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). A defendant "cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in the Defendant's shoes would have understood that he was violating it." *Plumhoff v. Rickard*, 572 U.S. 765, 778-79 (2014).

On summary judgment, Jensen bears the initial burden of proving the Defendants violated rights clearly established under the Fourth Amendment. *Thompson v. Souza*, 111 F.3d 694, 698 (9th Cir. 1997). Jensen has not made *any* showing with respect to qualified immunity, and it is clearly established that cross-gender searches are allowed under certain circumstances.

In *Michenfelder*, the Ninth Circuit upheld a visual body cavity search conducted in the presence of the opposite gender. 860 F.2d at 333. In reaching this conclusion, the Ninth Circuit analyzed the strip search in light of the balancing test set forth by the Supreme Court in *Bell*. The *Michenfelder* Court "recognized that not all strip search procedures will be reasonable; some could be excessive, vindictive, harassing, or unrelated to any legitimate penological interest." *Id.* at 332. However, "so long as a prisoner is presented with the opportunity to obtain contraband or a weapon outside of his cell, a visual strip search has a legitimate penological purpose." *Id.* at 333. When a prisoner has had the opportunity to obtain contraband outside of her cell, the prisoner "bears the burden of showing that [prison] officials intentionally used exaggerated or excessive means to enforce security." *Id.* Here, it is undisputed Jensen had the opportunity to, and in fact, did,

obtain drugs while she was on work release, and she has not made any showing that the officers intentionally employed "exaggerated or excessive means" during the search. *Id.*

In *Grummett v. Rushen*, 779 F.2d 491, 492 (9th Cir. 1985), prison inmates challenged a prison policy of allowing female guards to view male inmates while dressing, showering, being strip searched, and using toilet facilities. The Ninth Circuit rejected this challenge, reasoning that "[t]o restrict the female guards from positions which involve occasional viewing of the inmates would necessitate a tremendous rearrangement of work schedules, and possibly produce a risk to both internal security needs and equal employment opportunities for the female guards." *Id.* at 495. The *Grummett* Court further concluded pat-down, clothed searches (including of the groin area) performed by female guards on male inmates were not so offensive as to be unreasonable under the Fourth Amendment. *Id.* at 492, 496.

Finally, a "litany of cases over the last thirty years has a recurring theme: cross-gender strip searches *in the absence of an emergency* violate an inmate's right under the Fourth Amendment to be free from unreasonable searches." *Byrd*, 629 F.3d at 1146 (emphasis added). Jensen has not cited, and the Court has not located, any authority to suggest cross-gender strip searches are unconstitutional where, as here, they are conducted under emergent circumstances.

For purposes of qualified immunity, the dispositive question is "whether the violative nature of particular conduct is clearly established." *Ashcroft*, 63 U.S. at 741. While "a case directly on point" is not required for a right to be clearly established, "existing case precedent must have placed the statutory or constitutional question beyond

debate." *Id.* This specific inquiry is "especially important in the Fourth Amendment context," where the Supreme Court "'has recognized that it is sometimes difficult for an officer to determine how the relevant legal doctrine . . . will apply to the factual situation the officer confronts.'" *Mullenix v. Luna*, 136 S.Ct. 305, 308 (2015) (quoting *Saucier*, 533 U.S. at 205)). In the absence of any authority that "squarely governs the case here," the Defendants are entitled to qualified immunity and Jensen's Fourth Amendment claims fail as a matter of law. *Brosseau v. Haugen*, 543 U.S. 194, 201 (2004).

## V. ORDER

1. Defendants' Motion for Summary Judgment (Dkt. 28) is **GRANTED**.

2. Court will enter a separate Judgment in accordance with Fed. R. Civ. P. 58.

DATED: September 28, 2021

David C. Nye
Chief U.S. District Court Judge

MEMORANDUM DECISION AND ORDER - 18